# In the United States Court of Federal Claims

No. 23-457
Filed under seal: September 28, 2023
Reissued: October 12, 2023[*]
FOR PUBLICATION

---

**BEAR MOUNTAINSIDE REALTY LLC,**

          *Plaintiff,*

v.

**UNITED STATES,**

          *Defendant.*

---

*Gordon Griffin*, Holland & Knight LLP, Washington, D.C., with *Hillary J. Freund* and *Richard Ariel*, of counsel, for the plaintiff.

*Matney E. Rolfe*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., with *Leigh Erin S. Izzo*, General Services Administration, and *Nicholas A. Richardi*, Internal Revenue Service, of counsel, for the defendant.

## MEMORANDUM OPINION

**HERTLING**, Judge

        The plaintiff, Bear Mountainside Realty LLC ("Bear Mountainside") owns an office building in Mountainside, New Jersey, in which the General Services Administration ("GSA") leased office space for the Internal Revenue Service ("IRS") at the time this case was filed. The plaintiff submitted a proposal in response to a solicitation by the GSA for a long-term lease for office space for the IRS. The GSA subsequently cancelled the procurement at the request of the IRS, which claimed its business needs had changed. Bear Mountainside filed this bid protest challenging the cancellation. The plaintiff alleges that the cancellation decision was made in bad

---

[*] Pursuant to the protective order in this case, this opinion was filed under seal on September 28, 2023. The parties were directed to propose redactions of confidential or proprietary information by October 11, 2023. The defendant submitted proposed redactions on October 11, 2023. (ECF 56.) The plaintiff did not propose any redactions. The Court adopts the defendant's redactions, as reflected in this public version of the opinion. Redactions are denoted with three asterisks in square brackets, [***].

faith based on a pretextual rationale, was made without an adequate consideration of the plaintiff's bid, lacked a rational basis, and was inadequately documented.

Following the defendant's filing of the administrative record, the plaintiff was allowed to supplement the administrative record with emails of several IRS employees obtained through a Freedom of Information Act ("FOIA") request. *Bear Mountainside Realty LLC v. United States*, No. 23-457, 2023 WL 4399993 (Fed. Cl. July 7, 2023) (supplementing the administrative record with ECF 1-1 at 7-8, 11-12, 13, 22, 30-31; ECF 1-2 at 6-7). The plaintiff was also allowed to submit interrogatories to an IRS employee. *Bear Mountainside Realty LLC v. United States*, No. 23-457, 2023 WL 5274386 (Fed. Cl. Aug. 9, 2023). The emails show that certain IRS employees disliked and did not want to occupy the plaintiff's building. The interrogatory response purports to explain that the solicitation was cancelled due to the IRS's changing business needs attributable to the resumption of in-office work after the COVID-19 pandemic and the additional funding provided under the Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818. (ECF 43-1.)

Both parties move for judgment on the administrative record under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). (ECF 42; ECF 44.) The plaintiff argues that the supplemented record demonstrates IRS officials had a specific animus against the plaintiff's office building, that this animus was the primary reason for the IRS's request to cancel the solicitation, and that the stated rationale for cancelling the solicitation contradicts other justifications in the record. The cancellation is therefore arbitrary and capricious. Bear Mountainside also argues that the GSA contracting officer, Alanna Fitzpatrick, failed to document adequately the cancellation determination. The defendant counters that the GSA provided a reasonable rationale for cancelling the solicitation, that the plaintiff has not overcome the presumption of good faith for the cancellation, and that the plaintiff simply disagrees with the contracting officer's decision.

The record reflects that some IRS employees may have had improper motives in disfavoring the plaintiff's building and in not wanting to occupy it. While the record reveals some evidence of bad faith on the part of IRS employees, the evidence is insufficient to show under the applicable clear and convincing evidence test that the IRS requested cancellation of the solicitation for improper motives or bad faith.[1] The evidence of improper motive does not show that the IRS and GSA decisionmakers themselves harbored any improper motive or acted on the improper motives of others, and they are entitled to the presumption that they acted in good faith in cancelling the solicitation.

---

[1] Although the parties use the term "bad faith," the plaintiff's challenge may more properly be termed a challenge to the reliance by the IRS on improper motives in requesting cancellation of the solicitation. The opinion at points uses the term "improper motive" interchangeably to describe the plaintiff's "bad faith" claim.

In the absence of bad faith, the defendant's cancellation decision had a rational basis and was adequately documented. The plaintiff's motion for judgment on the administrative record is denied, and the defendant's cross-motion is granted.

## I.   BACKGROUND[2]

### A.   Prior Solicitations

The plaintiff is the owner of an office building in Mountainside, New Jersey, in which the GSA has leased space on behalf of the IRS since 2004. (AR 3039, 3043.)[3] The original lease expired in January 2012 but was extended four times, ultimately being set to end in September 2023. (*Id.*) The IRS also leases space in an office building in Springfield, New Jersey, less than one mile away from the plaintiff's building. (AR 21-22, 3576.)

In January 2012, the defendant issued a solicitation for a new lease for IRS office space which excluded from consideration the area in which the plaintiff's building is located. (AR 3592-94.) The plaintiff successfully protested this exclusion, and the solicitation was cancelled. (AR 3594.)

On February 6, 2019, several IRS employees, including Thomas Huba, whose title in April 2017 was "Associate Director – Facilities Management" (ECF 1-1 at 8), emailed each other concerning the possible move of a taxpayer assistance center out of the plaintiff's building, where it was located, and into the Springfield office building. (*Id.* at 22.) In these emails, one IRS employee noted that the "GSA has already agreed to run a modified/reduced [tenant improvement] procurement which gives the incumbent a significant advantage," seemingly referencing the Springfield building. (*Id.*)

On March 11, 2019, the IRS sent a request for office space to the GSA. (AR 1.) On September 24, 2020, IRS "portfolio specialist" John Lopez (AR 3811-12) emailed two other IRS employees, including Mr. Huba. Mr. Lopez noted that the plaintiff's building "is considered within the [delineated area]" and continued "I thought that we tried keeping them out however I remember the fear that GSA has with this lessor and her protest letters." (ECF 1-1 at 30.)

Notwithstanding these concerns, the IRS's request led to the GSA issuing a solicitation for IRS office space in May 2021, and the plaintiff submitted an offer. (AR 3039-40.) The solicitation required a $2.50 per-square-foot tenant-improvement allowance for the Springfield office location because it was "leased directly by the IRS," while requiring a $55.62 per-square-foot allowance for all other locations. (AR 3043-44.) The plaintiff protested this discrepancy before the Government Accountability Office ("GAO"). The solicitation was cancelled after the

---

[2] This recitation constitutes findings of fact based on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005).

[3] Citations to the administrative record (ECF 22-2) are cited as "AR" with the pagination reflected in that record as filed with the court.

defendant produced a cost-benefit analysis showing substantial savings from continuing the existing Springfield lease rather than moving IRS offices to another location. (AR 3044, 3594-96.) The plaintiff then protested this cancellation of the solicitation, and the defendant voluntarily took corrective action by reissuing the solicitation. (AR 3044, 3596.)

### B.    Current Solicitation

The GSA subsequently issued the third (after the 2012 and 2021 solicitations), and current, solicitation for IRS office space in that part of New Jersey on June 16, 2022. (AR 720-23.) The solicitation sought between 36,642 and 40,574 square feet of office space on a lowest-price, technically-acceptable basis in a geographic area that included Mountainside and Springfield. (AR 22, 720, 2767.) The "[p]roject background/trigger event" in the GSA's "Project Management and Acquisition Plan," dated September 9, 2020, noted that:

> IRS currently occupies 32,019 RSF/ 27,842 ABOA SF of office space located at 200 Sheffield Street in Mountainside, New Jersey which expires September 24, 2021. IRS also occupies 46,469/ RSF of space under a delegated lease located at 955 S. Springfield Avenue in Springfield, New Jersey, which expires in February 16, 2021[.] The IRS will be consolidating both offices for a total amount of 44,438/ RSF or 38,642/ABOA SF. In the meantime IRS will be protecting occupancy through a lease extension and GSA as well to align both leases with the long term leasing action. The estimated project scheduled occupancy date is May 18, 2022.

(AR 21.) The GSA contracting officer responsible for this solicitation was Alanna Fitzpatrick.

In August 2022, the plaintiff submitted its offer. (AR 2916, 2985; *see also* AR 2600 (Austin Sanders identifying himself as a representative of the plaintiff's property).) On September 30, 2022, the GSA emailed Bear Mountainside, asking it to confirm the "very low" shell and operating rent reflected in its offer. (AR 3079.) The plaintiff confirmed its offer. (*Id.*)

On September 22, 2022, Mr. Lopez emailed Mr. Huba and a third IRS employee, Terry Mount, the Chief of Portfolio Management in the Real Property division of IRS Facilities Management and Security Services ("FMSS"), emphasizing Mr. Huba's point from a 2017 email in which Mr. Huba had suggested that he tell the GSA "**[t]he current [plaintiff] building is unacceptable to IRS. We will not agree to occupy this building if GSA runs a competitive action**." (ECF 1-1 at 7 (emphasis in original).) Later that same day, Mr. Lopez and Mr. Huba emailed each other and Mr. Mount, concerning the solicitation. (ECF 1-2 at 6-7.) In these emails, Mr. Lopez explained that he was sending "[y]et another negative [e]-mail" notifying the others that he had been told "at a [p]re-award" that the plaintiff "would probably win" the solicitation. (*Id.*) Mr. Lopez bemoaned that he "was very against even considering [the plaintiff] as the choice," that the facility has "a long list of deficiencies that were not addressed," and that the plaintiff's building "has been a harrow. I'll say it again some of our executives are not happy with some of our inferior buildings." (*Id.* at 7.) Mr. Lopez bemoaned this solicitation as "the straw that will break [his] back" and noted that "GSA was informed that we did not want this building [but] GSA said that they were concerned with litigation proceedings." (*Id.* at 6-7.)

4

In response, Mr. Huba emailed Mr. Lopez and Mr. Mount, writing "DON'T SIGN ANY[ ]AWARD LETTERS."  Mr. Huba continued: "we in Portfolio will probably need to lead the decision and messaging to GSA."  (*Id.* at 6.)  Mr. Huba also "wonder[ed] sometimes how we got to this point.  If there was a market survey, why did we not tell GSA to eliminate a building.  Sure would have a letter on file telling GSA that we will not occupy [the plaintiff's building] if awarded.  That's where we are heading now unfortunately."  (*Id.*)  It is not clear from the context whether Mr. Huba was referring in that last sentence to having such a letter on file or occupying the plaintiff's building.  Mr. Huba also added that "we should have made the territory move from [the plaintiff's building] into Springfield two years ago when we talked about it."  (*Id.*)

On October 20, 2022, Mr. Mount emailed Ms. Fitzpatrick that "[t]he IRS would like to cease the current acquisition process.  We are reviewing our business needs and will submit revalidated requirements in the near future."  (AR 3572.)  On October 27, 2022, Francis McClain, a "Facilities Management Consultant" (AR 1262), emailed Mr. Mount, Mr. Lopez, Mr. Huba, and two other recipients detailing "FMSS['s] new strategy . . . for the Springfield, Mountainside and Iselin [posts of duty]."  (ECF 1-1 at 11.)  Mr. McClain outlined a plan to relocate certain IRS business units to Springfield, release the plaintiff's lease, and later relocate the Springfield office to the [***] area.  That same day, Mr. Mount forwarded Mr. McClain's email to two new recipients, while copying Mr. Huba and Mr. Lopez.  In his forwarding email, Mr. Mount noted that "[d]ue to lessor issues in Mountainside and GSA reluctance to engage with lessor[']s threats of filing grievance actions against them, the strategy is changing for the Springfield/Mountainside locations."  (*Id.*)

On October 31, 2022, Ms. Fitzpatrick informed Mr. Mount that she would "need more information before [she] can proceed with any cancellation."  (AR 3573 (labeled incorrectly as a second AR 3572).)  She asked Mr. Mount if the delineated area for the space would be changing, and, if so, to what location and for what reason.  She also asked if the IRS's square-footage needs would be changing.  (*Id.*)

On November 3, 2022, Mr. Mount responded to Ms. Fitzpatrick, writing:

> We will be terminating the Mountainside lease and looking to consolidate IRS operations there and in Springfield to the [***] area due to changing IRS business needs. The [***] area is walking distance to the Northeastern Corridor Train Rail and Ideal [sic] location for IRS employees and customer commuting. Our USF will increase due to planned new hires and need for additional storage space. We are still discussing location need for our Taxpayer Assistance Center in Springfield.  Once that decision has been made, a new DA, FMSS-81, and full requirements package will be provided [to] GSA.

> Please let me know if you have additional questions.  If not, expect to receive our requirements package within the next week or two.

(AR 3574.)[4]

On November 16, 2022, the GSA informed the plaintiff that the solicitation was cancelled.  (ECF 22-1 at 4; AR 3031.)  The GSA explained that the solicitation was cancelled "due to a change in circumstances," and that "[t]he Government is reevaluating requirements.  It is, therefore, in the best interests of the Government to cancel the [solicitation]."  (AR 3031.)

### C.       Plaintiff's Bid-Protest Filings

On November 28, 2022, the plaintiff filed a protest with the GAO, challenging the cancellation of the solicitation as improper.  (ECF 22-1 at 4; AR 3038-53.)

In response, the IRS provided the GAO an affidavit signed by its "[FMSS] Associate Director Operations East," Gary J. Lombardi.  (AR 3809-10.)  In the affidavit, Mr. Lombardi averred that "there have been a number of changes to the needs of the IRS . . . result[ing] in a need to cancel the [s]olicitation . . . as that [s]olicitation may not reflect the current needs of the Agency."  (AR 3809.)  Mr. Lombardi further noted that "[t]he IRS has not yet determined what its final needs for office space in this region of New Jersey are at this time," and that return to office activities following COVID-19 had shown that the way the IRS "workforce performs its duties has drastically changed," causing "the IRS [to] believe[ ] that consolidation of offices may better meet the Agenc[y's] need."  (*Id.*)  According to Mr. Lombardi, the IRS had "not reached a final decision with regards to how much space will be required, what the specific requirements of that space will be, and where that space would best be located."  (*Id.*)

The GAO denied the plaintiff's protest on February 28, 2023.  (AR 3824-33.)  The plaintiff subsequently filed its present complaint on March 31, 2023, continuing to challenge the cancellation of the solicitation.  (ECF 1.)

On May 25, 2023, the plaintiff filed a motion to supplement the administrative record.  (ECF 23.)  The plaintiff sought to add to the administrative record certain documents, including emails sent by IRS employees, obtained through a FOIA request.  The plaintiff also sought to take depositions of certain IRS employees and to conduct discovery into internal IRS

---

[4] The consolidation noted in the 2020 GSA project plan, still reflected in the 2022 solicitation, and by Mr. Mount in seeking and then justifying the cancellation of the solicitation appear to stem from different sources.  As the defendant explained at oral argument, the consolidation referenced in the GSA project plan was based on the GSA's desire to consolidate excess office space between the Springfield and Mountainside offices after the GSA had assumed responsibility for IRS leasing and was in the process of taking over the Springfield lease from the IRS, which had previously been responsible for leasing its own space.  (*See* AR 3039, 3043-44 3579-80 (referencing the IRS directly leasing the Springfield office and the ongoing process to substitute the GSA for the IRS as the lessee).)  In contrast, Mr. Mount, when referencing consolidation as a basis for cancelling the solicitation, was directly addressing the IRS's own requirements, which by 2022 included a possible move to the [***] area.  (AR 3574.)

documentation and communication, interagency communication between the GSA and IRS, and internal GSA documentation and communication.

On June 23, 2023, the plaintiff's motion was granted-in-part and denied-in-part. *Bear Mountainside*, 2023 WL 4399993. The plaintiff was allowed to supplement the administrative record with specific IRS-employee emails. *Id.* at *4-5, 7 (supplementing the administrative record with ECF 1-1 at 7-8, 11-12, 13, 22, 30-31, and ECF 1-2 at 6-7). The plaintiff's request was otherwise denied. Pending the completion of the response to the plaintiff's FOIA request, the denial was without prejudice regarding the plaintiff's requests to depose Mr. Mount and for discovery of documents and emails involving Mr. Mount dated between June 16, 2022, and November 16, 2022. *Id.* at *6-7.

The plaintiff subsequently received the remaining documents responsive to its FOIA request. (ECF 35.) The plaintiff averred that the documents produced included only one relevant email that had not previously been provided, specifically "a draft justification for the request for cancellation that was never submitted to GSA." (*Id.* at 2 n.1.)

On July 28, 2023, the plaintiff filed a second motion to supplement the administrative record. (*Id.* at 1.) The plaintiff sought permission to take depositions of Mr. Mount and Ms. Fitzpatrick or, in the alternative, to serve interrogatories on the defendant. (*Id.*)

On August 9, 2023, the plaintiff's motion was granted-in-part and denied-in-part. *Bear Mountainside,* 2023 WL 5274386. The plaintiff was permitted to serve some of its requested interrogatories, with certain modifications, seeking information as to what IRS officials did or knew. *Id.* at *3-4. The plaintiff's request for depositions was denied as overly intrusive. *Id.* at *3.

Mr. Mount responded to the interrogatories on behalf of the IRS on August 16, 2023. (ECF 43 at 2; ECF 43-1.) In the response, Mr. Mount denied that either the IRS's request to the GSA to cancel the solicitation or that the strategy referenced in his October 27, 2022, email forwarding Mr. McClain's email was part of an effort to avoid awarding the contract to the plaintiff. (ECF 43-1 at 4-5.) Mr. Mount instead explained that the IRS had first started to reexamine its office-space requirements following the "June 2022 Return to the Office order." (*Id.* at 2-4.) Mr. Mount also averred that the August 2022 enactment of the Inflation Reduction Act, which appropriated approximately $80 billion in additional funding to the IRS, contributed to these discussions because the funding could change the IRS's office-space needs to accommodate the newly funded positions. (*Id.*) These discreet events could lead to potential new hires, a need for additional training space, and increased telework and remote work, causing the IRS to seek to consolidate its offices. (*Id.*)

Mr. Mount also claimed that Ms. Fitzpatrick told Mr. McClain in "early September 2022" that there were only two offerors under the solicitation. (*Id.* at 4.) Mr. Mount noted that Mr. McClain "was not told officially that Bear Mountainside was to be awarded the lease until after the IRS received notice that Bear Mountainside was protesting the procurement." (*Id.*)

7

On August 31, 2023, the parties filed cross-motions for judgment on the administrative record.  (ECF 42; ECF 44.)  On September 14, 2023, the parties filed their respective responses. (ECF 48; ECF 49.)  Oral argument was held on September 21, 2023.

## II.      JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Actions brought under this provision are typically called bid protests.

The plaintiff has alleged the defendant violated the law by acting irrationally, unreasonably, and contrary to procurement law when it cancelled the solicitation. Accordingly, the plaintiff's claims fall within the bid-protest jurisdiction of the court.

For a plaintiff to have standing in a bid protest, it "must be an 'interested party,' 28 U.S.C. § 1491(b)(1), that is, a party with a substantial chance of securing the award." *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023).  The defendant does not challenge the plaintiff's standing.  Because the plaintiff submitted a bid that was reasonably likely to succeed (ECF 1-2 at 6-7),[5] the plaintiff is an interested party and has standing to sue.

## III.     STANDARD OF REVIEW

On a motion for judgment on the administrative record pursuant to RCFC 52.1, the court's review is limited to the administrative record, with findings of fact made as if there was a trial on a paper record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005).  The court must determine whether a party has met its burden of proof based on the evidence in the administrative record.  *Id.* at 1355-56.  Genuine issues of material fact will not foreclose judgment on the administrative record.  *Id.*

Bid protests require a two-step analysis.  *Id.* at 1351.  First, the court must determine whether the government's conduct is "arbitrary and capricious" or "not in accordance with law" under 5 U.S.C. § 706.  *Id.* (citing 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4)).  A court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).  Second, if the government's conduct was "arbitrary

---

[5] This document is an email in which Mr. Lopez informed Mr. Huba and Mr. Mount that "[t]he Territory called a meeting regarding GSA's choice to Award [the plaintiff] the lease instead of Springfield" and "[w]e learned that [the plaintiff] would probably win the Award at a Pre-award."

and capricious" or "not in accordance with law," the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351.

A court's review of the procurement decision made by the procuring agency in a bid protest is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court "might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (cleaned up). A court must take care not to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

"Government officials are presumed to carry out their duties in good faith." *Spezzaferro v. F.A.A.*, 807 F.2d 169, 173 (Fed. Cir. 1986).

> In order to overcome the presumption of good faith on behalf of the government, the proof must be almost irrefragable. Almost irrefragable proof amounts to clear and convincing evidence. In the cases where the court has considered allegations of bad faith, the necessary irrefragable proof has been equated with evidence of some specific intent to injure the plaintiff.

*Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (cleaned up).

> "A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable*.'"

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (emphasis in original) (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir.1993)).

In contrast to claims of bad faith, "[a] disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence." *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 124 (2021); *see also Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 578 (2017) ("The protester must demonstrate, by a preponderance of the evidence, the absence of any rational basis for the agency decision.").

## IV.    DISCUSSION

Both parties move for judgment on the administrative record under RCFC 52.1. (ECF 42; ECF 44.)

9

### A.     The Parties' Arguments

The plaintiff offers four grounds for why it should prevail.

To begin, the plaintiff, relying on *Parcel 49C Limited Partnership v. United States*, 31 F.3d 1147 (Fed. Cir. 1994), and *Tech Systems, Inc. v. United States*, 98 Fed. Cl. 228(2011), argues that it may prevail by showing the solicitation was cancelled "'at the whim' of the tenant agency" by a preponderance of the evidence for purposes of showing a lack of a rational basis or a failure to fairly consider all bids. (ECF 42 at 28; *see also* ECF 48 at 8-9; 22.) As for bad faith, the plaintiff agrees that it must make this showing by clear and convincing evidence. (ECF 42 at 17 (citing *Galen Medical Assoc.*, 369 F.3d at 1330).)

Applying these standards, the plaintiff first argues that the supplemented record, specifically the emails sent by IRS employees, shows the IRS acted in bad faith when it requested the GSA cancel the solicitation. (*Id.* at 17-26.). The plaintiff further argues that there was no actual change in the IRS's requirements, meaning the IRS's proffered reasoning for requesting the solicitation be cancelled was pretextual. (*Id.* at 22-23, 25-26.)

Second, the plaintiff argues that the same evidence also shows that the defendant failed to fairly consider its bid. (*Id.* at 26-33.) In making these arguments, the plaintiff analogizes the present case to two other cases in which a tenant agency acted in bad faith in requesting the GSA cancel a solicitation for a lease, *Parcel 49C Limited Partnership* and *126 Northpoint Plaza Limited Partnership v. United States*, 34 Fed. Cl. 105 (1995), *appeal dismissed*, 73 F.3d 379 (Fed. Cir. 1995). (ECF 42 at 24-26, 28-32.)

Third, the plaintiff argues that the IRS's proffered reasoning for its request for cancelling the solicitation lacked a rational basis. (*Id.* at 33-36.) Because the reasoning offered by Mr. Mount to Ms. Fitzpatrick, by Mr. Lombardi to the GAO, and by the defendant's interrogatory response are contradictory and conflicting, the plaintiff argues, the defendant's decision to cancel the solicitation lacked a rational basis.

Finally, the plaintiff alleges that Ms. Fitzpatrick failed to document her cancellation determination adequately, in violation of 48 C.F.R. § 570.303-4, from the General Services Acquisition Regulations ("GSAR"). (*Id.* at 36-39.)

By contrast, the defendant asserts that *Am-Pro Protective Services* requires the application of a heightened burden to the plaintiff's claim of bad faith and the other claims raised by Bear Mountainside, because they are all intricately tied to the plaintiff's claim of bad faith. (*See* ECF 44 at 21-22; ECF 49 at 14.) Applying the clear and convincing evidence standard, the defendant argues that the regulatory standards of Federal Acquisition Regulation ("FAR") 15.206(e) apply to the decision to cancel this negotiated procurement and explains that these standards are "'extraordinarily permissive [in] that they impose no constraints upon a contracting officer's discretion beyond what reasoned judgment requires.'" (ECF 44 at 13-17 (quoting *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 126 (2010)).) Because the contracting officer's discretion is so high, the defendant argues, the plaintiff faces a higher burden to prove the decision was arbitrary and capricious. The defendant argues that "'as

applied to the cancellation of a negotiated procurement, the [Administrative Procedure Act] standard reduces to nothing more than rational-basis review.'"  (*Id.* (quoting *Madison Servs., Inc.*, 92 Fed. Cl. at 126-27).)  The defendant then argues that the GSA made a well-reasoned decision to cancel the solicitation, and that the record does not demonstrate bad faith.  (*Id.* at 17-21.)  Instead, the record demonstrates that the IRS's requirements had changed.

## B.  Bad Faith/Improper Motive

The plaintiff's arguments concerning bad faith rely on two pieces of evidence.  First, it cites IRS emails that were added to the administrative record.  Second, it argues that the IRS's asserted justification for the cancellation—that its requirements had changed—lacks support in the administrative record.  The combination of the email evidence added to the record and the absence of record evidence to support the justification for the cancellation might support an inference that the IRS requested the cancellation of the solicitation for an impermissible motive.  The evidence is sufficient to support an inference that the IRS acted based on an improper motive, but other evidence undercuts that inference.

On this record, however, the plaintiff has not demonstrated bad faith by clear and convincing evidence, as demanded by *Am-Pro Protective Services* and *Galen Medical Associates*.  As reflected by the level of evidence present in *Parcel 49C* and *126 Northpoint Plaza*, clear and convincing evidence of bad faith requires a party to show evidence of more than smoke; a party alleging bad faith must show the fire as well.  The record reflects a lot of smoke, but evidence of actual fire is inferential at best and inadequate to support a finding of bad faith.

### 1.  IRS Emails

The emails that were added to the administrative record show that IRS officials in contact with Mr. Mount, the IRS official who requested the termination of the solicitation, were biased against the plaintiff's building.  To go from bias to showing action based on an improper motive, and to overcome the presumption that a government official is acting in good faith, the plaintiff must show "[a]lmost irrefragable" proof, that is "clear and convincing evidence" of bad faith. *Galen Med. Assocs., Inc.*, 369 F.3d at 1330.  "'[T]he necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff.'"  *Id.* (quoting *Torncello v. United States*, 681 F.2d 756, 771 (Ct. Cl. 1982)).  That proof must show that government officials acted based on an improper motive, not simply that they had a *motivation* to do so.  S*ee Torncello*, 681 F.2d at 771 (emphasis added) ("Since good faith is presumed unless bad faith is shown, the government is prevented only from *engaging in actions motivated* by a specific intent to harm the plaintiff."); *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 706 (2000) (emphasis added) ("In order to overcome this presumption [of good faith], plaintiff must allege and prove, by clear and strong evidence, *specific acts of bad faith* on the part of the government.").

Evidence of such an intent to harm that would constitute clear and convincing evidence of an improper motive in general is lacking in this case.  The IRS emails added to the record support the plaintiff's argument that the IRS was biased against it and had a motivation to act based on an improper motive.  The emails, however, do not show clear and convincing evidence

that the IRS's request to the GSA to cancel the solicitation was, in fact, based on the improper motives reflected in the internal IRS emails.

As a preliminary matter, the defendant argues that the motives of IRS employees are irrelevant because the GSA's independent decision to cancel the solicitation cures any improper motive on the part of the IRS.  The evidence undercuts that argument.  "'Bad faith has been found when a contracting officer representative acts with specific intent to injure or the contracting officer fails to exercise independent judgment or remedy the contracting officer representative's animus, such as by removing the contracting officer representative from responsibility.'" *Kurkjian v. Sec'y of the Army*, No. 2020-2201, 2021 WL 3520624, at *5 (Fed. Cir. Aug. 11, 2021) (quoting *Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118-19 (2016)), *cert. denied sub nom. Kurkjian v. Wormuth*, 142 S. Ct. 1428 (2022), *reh'g denied*, 142 S. Ct. 2748 (2022).

Here, IRS officials acted similarly to a contracting officer's representative insofar as they provided the justification for the cancellation of the solicitation.  Although Ms. Fitzpatrick, GSA's contracting officer, requested additional information (AR 3573) after Mr. Mount claimed the IRS was "reviewing [its] business needs" (AR 3572), Ms. Fitzpatrick ultimately deferred to the IRS that there had been "a change in circumstances" and that "[t]he Government [was] reevaluating requirements."  (AR 3575.)  The record does not reflect that Ms. Fitzpatrick conducted any independent analysis of the IRS's asserted justification for the cancellation, instead implicitly accepting it as a sufficient basis to cancel the solicitation.  While Ms. Fitzpatrick had no reason to doubt Mr. Mount, the lack of any independent analysis or verification of Mr. Mount's justification shows that the GSA adopted the IRS's rationale without exercising independent judgment that might have cured any improper motive.  Because the GSA's actions cannot have cured any improper motivation by the IRS in this case, the IRS's motive for its actions must be examined.

There is evidence that certain IRS officials were biased against the plaintiff's building dating back to 2017.  In April 2017, Mr. Huba emailed Mr. Lopez to "suggest that you tell GSA at the meeting tomorrow" that the plaintiff's building "**is unacceptable to IRS.  We will not agree to occupy this building if GSA runs a competitive action**."  (ECF 1-1 at 7-8 (emphasis in original).)  Mr. Huba went so far as to say that the IRS should request that the GSA undertake an "'Other than Full and Open Competition' and negotiate with the Springfield lessor for a long term lease.  **Doing anything else will be a waste of time for GSA and for IRS**."  (*Id.* (emphasis in original).)  While reflecting disfavor towards Bear Mountainside's property, Mr. Huba's email also explained that one reason for his view was that "the IRS has too much space at the [plaintiff's] office."  (*Id.*)  On the other hand, Mr. Huba noted that the IRS had unused space in the Springfield building, which he considered "superior."  (*Id.*)  In any case, this email is from early 2017, the views expressed by Mr. Huba are unlikely to have remained valid in the intervening years, especially given the factors on which the IRS purported to rely in seeking cancellation of the solicitation.

While this 2017 email reveals that Mr. Huba preferred the Springfield building to the plaintiff's, the record does not reflect how widely shared this view was.  It is also unclear whether his email only suggested an internal IRS desire to push the GSA to conduct an Other

12

than Full and Open Competition or whether it represented an actual plan to avoid leasing space from the plaintiff.

In 2019, IRS officials, including Mr. Huba, discussed a plan to move the taxpayer assistance center from the plaintiff's building to the Springfield building. (ECF 1-1 at 22.) The relevant email indicates that the "GSA has already agreed to run a modified/reduced [tenant-improvement] procurement which gives the incumbent," meaning Springfield, "a significant advantage . . . ." (*Id.*) This email likely refers to what became the 2021 solicitation in which the plaintiff was required to offer a substantially higher tenant-improvement allowance compared to its Springfield competitor. As noted, the plaintiff successfully protested this imbalanced tenant-improvement allowance at the GAO.

The administrative record contains no other references to these events beyond the plaintiff's filings to the GAO and a couple of stray references in internal GSA emails. (AR 150, 334-35, 3044, 3655.) These provide an insufficient basis for evaluating the good or bad faith of the IRS and the GSA, as they do not explain any reasoning underlying the decision to impose disparate tenant-improvement allowances. Without clearer evidence, the 2019 Huba email and the events surrounding the 2021 solicitation add little to the plaintiff's case.

In September 2020, Mr. Lopez emailed Mr. Huba noting that he thought the IRS had sought to keep the plaintiff's building out of the delineated area for office space in the solicitation. (ECF 1-1 at 30-31.) Mr. Lopez also noted in that email that "there will not be enough parking at [the plaintiff's building]." (*Id.* at 30.) Mr. Lopez also suggested that litigation risks were a concern to GSA officials, writing "I thought that we tried keeping them out however I remember the fear that GSA has with this lessor and her protest letters." (*Id.*; *see also id.* at 11 (Mr. Mount in October 2022 noting "GSA reluctance to engage with lessor[']s threats of filing grievance actions against them").) This email suggests a potential bias against the plaintiff, but it also reflects substantive concerns with parking at the plaintiff's building. It is unclear whether the attempt, referenced in the email, to keep the plaintiff's building out of any solicitation's delineated area for office space was based on an improper motive or whether it was an attempt to avoid potential protests when there also were potentially legitimate reasons to exclude the plaintiff's building from consideration.

Two years later, in September 2022, Mr. Lopez forwarded Mr. Mount and Mr. Huba the April 2017 email, emphasizing its point that the plaintiff's building was unacceptable to the IRS and that the IRS would refuse to occupy it. (ECF 1-1 at 7-8.) Later that same day, Mr. Lopez sent Mr. Mount and Mr. Huba "another negative E-mail" informing them that "[t]he Territory called a meeting regarding GSA's choice to [a]ward [the plaintiff] the lease instead of Springfield."[6] (ECF 1-2 at 6-7.) Mr. Lopez also noted that "[w]e have a long list of deficiencies

---

[6] The defendant argues that "there was no way for IRS to know with any real amount of confidence who would ultimately receive the award" because the GSA was still "evaluating proposals, preparing deficiency letters, and it had not yet requested best and final offers." (ECF

that were not addressed," calling Springfield "a very nice building and [the plaintiff's] has been a harrow." (*Id.* at 7.)

Mr. Huba responded, exhorting Mr. Lopez and Mr. Mount "DON'T SIGN ANY[ ] AWARD LETTERS" and requesting "a full discussion on this tomorrow." (*Id.*)  Mr. Huba also inquired "why did we not tell GSA to eliminate a building.  Sure would have a letter on file telling GSA that we will not occupy [the plaintiff's building] if awarded.  That's where we are heading now unfortunately." (*Id.* at 6.)  Mr. Huba continued by noting "[w]e should have made the territory move from Mountainside into Springfield two years ago when we talked about it." (*Id.*)  Responding to Mr. Huba, Mr. Lopez clarified "[w]e learned that [the plaintiff] would probably win the Award at a Pre-award." (*Id.*)

These emails reflect that Mr. Huba and Mr. Lopez did not want to occupy the plaintiff's building.  Mr. Huba and Mr. Lopez, however, always based their opposition to remaining at the plaintiff's building on perceived inadequacies with the building.  None of the emails indicate that Mr. Huba or Mr. Lopez wanted to harm the plaintiff by not contracting with Bear Mountainside.  References in the emails to the plaintiff's ownership reflect GSA concerns over the prospect of litigation, not IRS concerns.  The IRS emails reflect only that IRS officials wanted to avoid being in what they considered an inadequate building.  While Mr. Huba's 2017 email and the September 2022 emails suggest that the IRS might refuse to occupy the plaintiff's building if the award was made to Bear Mountainside, the emails do not show any concrete plan to put this idea into effect.

In short, the emails provide evidence that some IRS officials may have been allowing improper motives to influence their perspectives on the solicitation.  The evidence from the emails may also support an inference that these officials may have sought to act based on these motives.  The emails do not, however, show clear and convincing evidence that IRS officials had improper motives or acted in bad faith or with any intent to harm the plaintiff when Mr. Mount asked the GSA to cancel the solicitation.

Importantly, the emails discussed so far were not written by Mr. Mount, the Chief of the Real Property Portfolio of FMSS and the official who requested that the GSA cancel the solicitation.  Although he received the emails sent by Mr. Huba and Mr. Lopez in September 2022, there is no clear and convincing evidence reflecting that Mr. Mount shared the biased

---

49 at 17, 20 (citing AR 3255).)  While that argument may be accurate, it misses the point.  Mr. Lopez's email shows that he subjectively believed that the GSA was going to award the contract to the plaintiff, or at least that the plaintiff was "probably" going to get the award (ECF 1-2 at 6), and it is that subjective belief that would motivate him and his IRS colleagues to act based on an improper motive.  Further, Mr. Mount's interrogatory response noted that "Mr. McClain was not told officially that Bear Mountainside was to be awarded the lease until after the IRS received notice that Bear Mountainside was protesting the procurement."  (ECF 43-1 at 4.)  This claim by Mr. Mount implies that Bear Mountainside, as far as the IRS was concerned, "was to be awarded the lease."  (*Id.*)

views of his colleagues.  *See Tech Sys.,* 98 Fed. Cl. at 267  (noting a need to show that an official who has an animus against a party had the actual influence to taint agency action with that bias).

The only email from Mr. Mount in the administrative record, other than the emails he sent to the GSA requesting cancellation of the solicitation, was written in October 2022—after he had requested the solicitation be cancelled.  In that email, Mr. Mount forwarded Mr. McClain's email about "FMSS['s] new strategy . . . for the Springfield, Mountainside and Iselin [post of duty]."  (ECF 1-1 at 11.)  In addition to sharing Mr. McClain's email, Mr. Mount wrote that "[d]ue to lessor issues in Mountainside and GSA reluctance to engage with lessor[']s threats of filing grievance actions against them, the strategy is changing for the Springfield / Mountainside locations."  (*Id.*)

The plaintiff argues that this email shows "Mr. Mount explicitly not[ing] that this 'strategy' was enacted ***solely*** to get GSA on board with the pending request to cancel the Solicitation."  (ECF 42 at 16 (emphasis in original).)  The plaintiff's reading of the email is plausible, but it is not the only plausible reading.  Nowhere in this email does Mr. Mount note he is trying to get the GSA onboard with any strategy.  Contrary to the plaintiff's implicit suggestion, Mr. Mount's use of the word "strategy" is not inherently indicative of some malicious intent.  While the plaintiff correctly points out that Mr. Mount's email does not reference "any changed requirements, the Inflation Reduction Act, or any return to work order" as the basis for the IRS's request to cancel the solicitation (ECF 42 at 22), the plaintiff does not explain why such a reference would be expected in this context.  Mr. Mount was sharing with colleagues a proposed plan of action under which the IRS was already "looking at consolidating the Mountainside [post of duty] into the Springfield [post of duty] since [employees in one business unit] no longer come into the office and [that unit] is the largest [business unit] in Mountainside [post of duty] . . . ."  (ECF 1-1 at 11.)  Mr. Mount's reference to a changing strategy could refer to a reconsideration of the specifics of that consolidation strategy, as indicated in his response to the plaintiff's interrogatories, rather than to a strategy to leave the Mountainside office.  (ECF 43-1.)  In sum, Mr. Mount's email can support the plaintiff's proposed reading that it is evidence of a plot to harm the plaintiff, but it is just as susceptible to a reading without nefarious intent or purpose.  In either case, the email falls far short of the "almost irrefragable" proof needed to show improper motive by the IRS.

Mr. Mount and other IRS officials never indicated in any of their emails that the enactment of the Inflation Reduction Act, with its substantial increase in authorized funds and positions for the IRS, or the return-to-work order, or a combination of the two factors motivated the request to Ms. Fitzpatrick to cancel the solicitation, as he avers in his interrogatory response.  (ECF 42-1.)  Yet, the reality of the circumstances faced by the IRS in 2022 cannot be ignored.  The explanation offered by the interrogatory response is not inconsistent with Mr. Mount's explanation in his emails to Ms. Fitzpatrick; the response offers further context for those emails.  Both returning to the office and additional funding could have reasonably caused the IRS's needs for "[usable square footage to] increase due to planned new hires and need for additional storage space."  (AR 3574.)  While the administrative record lacks any references to additional funding or attempts to bring employees back to the office after two years of working from home, Mr.

Lombardi's GAO affidavit can easily be read as a second-order explanation for the rationale offered in Mr. Mount's emails and is supported by the reality of life after the COVID pandemic.[7]

Despite the plaintiff's argument to the contrary, even if it is not directly symmetrical with Mr. Mount's justification to Ms. Fitzpatrick or with his interrogatory responses, Mr. Lombardi's affidavit does not on its face "directly contradict[ ] Mr. Mount's stated basis for the cancellation given to GSA." (ECF 42 at 31.)  Mr. Mount's October email can, as noted above, be read in a way that would not exonerate the IRS from the plaintiff's challenge.  Mr. Mount may be offering a different rationale for why the IRS is requesting the solicitation be cancelled: "due to lessor issues in Mountainside and GSA reluctance to engage with lessor[']s threats of filing grievance actions against" the GSA.  (ECF 1-1 at 11.)  Nonetheless, that statement does not explicitly convey or explain that these rationales are the true reasons that the IRS requested that the solicitation be cancelled.  The email is suspectable to multiple interpretations.  It may be that Mr. Mount was trying to avoid the Mountainside office due to the potentially improper motives expressed by Mr. Lopez and Mr. Huba.  It may be that Mr. Mount, having already determined there was a need to re-evaluate the IRS's space needs in the area, was explaining how the IRS's approach to the procurement would be changing to minimize the risk of litigation by seeking to leave the Mountainside and Springfield offices entirely.  *Cf. Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1366 (Fed. Cir. 2021) ("[T]he government has a substantial interest in not creating opportunities for litigation based on an erroneous bid and was not obligated to accept a bid that was contrary to the amended terms of its solicitation."); *Leeward Constr., Inc. v. United States*, 160 Fed. Cl. 446, 461-62 (2022) ("As the Federal Circuit recently acknowledged, an agency is not required to accept a bid if it creates a demonstrable risk of future litigation.").  This reading would align Mr. Mount's forwarding email with Mr. McClain's underlying email, which lays out a plan first to consolidate operations into the Springfield office, before relocating the Springfield office to the [***] area.  (ECF 1-1 at 11.)

Although his October email provides a basis to question Mr. Mount's motives, it is insufficient to conclude that it was highly probable Mr. Mount's rationale to the GSA was offered pretextually to avoid leasing the plaintiff's office.

Beyond the substance of Mr. Mount's October email forwarding Mr. McClain's email, the timing of that email, coming against the backdrop of the other internal IRS emails in the record, may provide circumstantial evidence that further supports the plaintiff's claim of bad

---

[7] To the extent that the plaintiff argues that Mr. Lombardi's affidavit contradicts either Mr. Mount's justification to the GSA to support the request to terminate the solicitation or his interrogatory response, this argument is not persuasive.  Although Mr. Lombardi referenced that "the IRS believes that consolidation of offices may better meet the Agenc[y's] need" (AR 3809), this explanation does not inherently contradict Mr. Mount's statement that the IRS's square-footage needs will increase (AR 3574).  It is quite possible to consolidate several smaller offices into fewer, larger ones.  This latter point appears to have been Mr. Mount's meaning when he explained to Ms. Fitzpatrick that the IRS was "looking to consolidate IRS operations" in the same email in which he also referenced the IRS's need for more usable square footage.  (*Id.*)

faith. The timing of the October email is suspicious. If the IRS was in fact considering changes to its office-space needs, one would expect the record to reflect the existence of internal deliberations that pre-date the request to cancel this procurement. Suspicious timing, either on its own or in combination with the other inferences that can be drawn from the record, is not enough to meet the plaintiff's burden of proof.

Instead, the silence in the record regarding the cancellation of this solicitation within the broader context of IRS office-space needs is not surprising. The plaintiff explained that its FOIA request was limited to "documents related to the [s]olicitation," and not anything broader. (ECF 1 at 8 n.1.) Such a narrow FOIA request seeking records specific to this solicitation would not be likely to generate documents related to broader IRS office-space requirements, and the silence in the record, as supplemented, about the IRS's review of its space needs in the area is understandable, even expected. The absence of documentation about the IRS's review of its office-space requirements and its relocation efforts in the relevant geographic area cannot be held against the defendant when the plaintiff's FOIA request was limited to documentation relevant to this solicitation. Documents related to the broader review by the IRS are not of a type that would have been considered by the GSA in its decision to cancel the solicitation at the IRS's request and would not normally be included in the administrative record. The lack of further clarity on that point and its relevance had been specifically noted during argument on the plaintiff's second motion to take further discovery. (*See* ECF 47 at 8:18-9:17, 16:6-10.) Bear Mountainside could have taken the opportunity to clarify that its FOIA request had broadly sought documents covering IRS office-space needs more generally in the wake of its return-to-office policies or the enactment of the Inflation Reduction Act, or both. If the FOIA request had been that broad, the absence of responsive documents would have been telling. A broad FOIA request that produced no documents would have undermined the defendant's proffered justification for the cancellation, providing a strong basis from which to infer that the silence in the record demonstrated that the IRS's justification was pretextual. Given that the scope of the plaintiff's FOIA request was apparently limited, such an inference cannot properly be drawn.

In sum, the emails added to the administrative record on the plaintiff's motion are sufficient to show that some IRS officials involved in the procurement disliked the plaintiff's building and may have considered improper motives in their reactions to Bear Mountainside's offer in response to the solicitation. These officials went so far as to suggest a willingness to take steps to avoid continued IRS occupancy of the plaintiff's building, even if the plaintiff had been awarded the lease. The record does not, however, satisfy the threshold of showing by clear and convincing evidence that the decisionmaker, Mr. Mount, either requested cancellation of the solicitation based on improper motives or provided a pretextual justification for that request when he informed the GSA that the IRS was "reviewing [its] business needs." (AR 3752.) The evidence also does not show that the IRS's review of its business needs was artificially devised to avoid awarding the lease to the plaintiff. (AR 3572, 3574.)

### 2.   *Parcel 49C* **and** *126 Northpoint Plaza*

The plaintiff attempts to bolster its argument of bad faith by analogizing its case to two prior cases in which a tenant agency was found to have acted improperly in requesting the GSA cancel solicitations for leases. These cases support the plaintiff's general proposition that a court

can examine a tenant agency's actions when the agency requests that the GSA cancel a lease solicitation and the GSA agrees to do so. Although only *126 Northpoint Plaza* applied the clear and convincing standard, the significantly stronger evidence of bad faith presented in both cases illustrates why the plaintiff has not met its burden to show bad faith here by clear and convincing evidence.

### a.    *Parcel 49C*

In *Parcel 49C*, the GSA "cancelled a solicitation for a new Federal Communications Commission (FCC) headquarters building." 31 F.3d at 1148. A judge of this court had determined that the cancellation violated the duty to consider fairly all responsive bids, and the Federal Circuit upheld this decision on appeal.

The FCC had initially asked the GSA to cancel the solicitation and revise the delineated area, and the GSA refused. *Id.* at 1149. The GSA received four best and final offers, the evaluation of which was "'marred by disagreement between GSA and FCC.'" *Id.* (quoting *Parcel 49C Ltd. P'ship v. United States*, No. 92-286C, 1994 WL 585905, at *1 (Fed. Cl. Mar. 14, 1994)). "'The source selection was to be based on who could provide the Government with the greatest value, while FCC wanted an award to go to the offeror that FCC believed best suited its own requirements.'" *Id.* (quoting *Parcel 49C P'ship*, 1994 WL 585905, at *1). The FCC requested the GSA award the contract to a bidder whose proposed rent exceeded the authorized ceiling. *Id.* The GSA refused and selected the FCC's second choice for award, a decision to which the FCC objected. *Id.*

Based on the testimony of GSA officials, including the Administrator, Judge Hodges found that the FCC undertook "'a campaign to scuttle the procurement'" and "'intended to take whatever steps were necessary to avoid going to [the awarded office]'" based on concerns that "'became critical to FCC only when [the awarded office] was selected.'" *Id.* (quoting *Parcel 49C Ltd. P'ship*, 1994 WL 585905, at *2). The FCC had gone so far as to communicate directly with the GAO to concede a protest that had been filed against the procurement, in violation of GAO procedures against such direct contact, and in contradiction to the FCC's earlier position on the merits of the protest. *Id.* at 1149. This contact had the effect of "undercutting GSA's defense of the . . . protest" and effectively "'backdoored' GSA into cancelling the procurement." *Id.* at 1151.

The plaintiff in *Parcel 49C* had substantially more evidence of improper agency action than Bear Mountainside has here. In *Parcel 49C*, the GSA Administrator, the official best positioned to understand what the FCC was doing outside of the FCC itself, testified that the FCC "'would take whatever steps necessary to cause this procurement not to go to [the awardee.]'" *Id.* The FCC also directly attempted to undercut the GSA in the GAO protest, in violation of GAO regulations, to force the solicitation to be cancelled. No evidence of anything remotely comparable is available to the plaintiff in this case.

*Parcel 49C* is not persuasive in supporting the plaintiff's claim that its evidence meets the clear and convincing threshold required to show an improper motive for the cancellation. Although *Parcel 49C* did not apply a clear and convincing threshold, the evidence in that case

stands in stark contrast to Bear Mountainside's ambiguous and lesser showing of evidence of improper motive.

      **b.**       ***126 Northpoint Plaza***

In *126 Northpoint Plaza*, the GSA issued a solicitation for space for use by the former Immigration and Naturalization Service ("INS"). 34 Fed. Cl. at 106. The solicitation was cancelled by the GSA at the request of the INS based on a claim that the INS's needs had substantially changed and the contracting officer's conclusion that cancellation "would lead to improved competition and better pricing." *Id.* at 107-08. The plaintiff filed suit alleging that the INS had not fairly considered its bid and, effectively, that the cancellation was based on a pretextual, bad-faith rationale. *Id.* at 106, 108-12. The plaintiff was joined by an intervenor, which had submitted the only offer under serious consideration before the GSA cancelled the solicitation. *Id.* at 108.

Despite noting the "broad" and "relatively high degree of discretion" afforded to contracting officers in negotiated procurements, the court found by clear and convincing evidence that the government had lacked a rational or reasonable basis to terminate the solicitation. *Id.* at 107, 112. Testimony indicated that the INS's objections arose only after INS employees had inspected the intervenor's building. *Id.* at 109. The INS then requested five modifications. The GSA worked each time to accommodate these requests by amending the solicitation. *Id.* at 108-10.

According to the GSA contracting officer, the changes requested were minor enough not to warrant cancelling the solicitation and were not even considered problems by the GSA. *Id.* The GSA contracting officer went so far as to call some of the INS's officials' concerns "foolish." *Id.* at 109. Nevertheless, he still cancelled the solicitation when the INS submitted a new request for space with additional changes to the requirements. Noting that the INS's objections that led to the cancelled solicitation were "trivial" and easily accommodated by further amendments to the first solicitation, *id*. at 109, the court concluded that "[i]t is clear [ ] that an amendment was not issued a sixth time only because INS wanted to avoid contracting with a particular offeror." *Id.* at 110.

"[M]ost telling" to prove that the INS had acted improperly, based on an "intent to avoid a contract with a particular building," was the INS assistant regional administrator's draft letter in which "he expressly directs GSA to kick out intervenor['s] building." *Id.* at 109-10 (footnote omitted). Although the final version of this letter did not reference the intervenor specifically, the court found that the letter was changed only because of comments by the GSA contracting officer. *Id.* The court determined that the contracting officer "[a]nticipating a legal conflict, [ ] informed the [INS] that he could not cancel a solicitation in order to avoid contracting with a particular qualified offeror, therefore, the agency had to formulate objective reasons for cancellation." *Id.* The court also found that cancellation of the procurement would not enhance competition because the only two buildings the contracting officer "had in mind to solicit" to submit bids were not available. *Id.*

As in *Parcel 49C*, the finding of agency error in *126 Northpoint Plaza* was based on substantially more evidence than can be found in this record. First, the INS's asserted changed circumstances were "trivial" and "foolish." By comparison, Bear Mountainside can point only to several emails reflecting IRS unhappiness over the plaintiff's building, potentially based on legitimate concerns about the plaintiff's building. Second, the INS repeatedly denied the bidder's ability to modify its facility to accommodate the INS's concerns. By comparison, the plaintiff can at best show that some IRS employees disliked the plaintiff's building and may have communicated this dislike to the GSA but cannot show that the IRS took active steps to deny the plaintiff the ability to address any concerns. Finally, and most importantly, the contracting officer testified to the INS's attempt to direct the GSA to kick out one of the bidders, leading to the "INS formulat[ing] its objective needs with an intent to disqualify a particular bidder." *Id.* at 110. Here, at best, the plaintiff can offer three IRS emails. One of those emails is from 2017 and suggests an IRS employee, who was not the decisionmaker here, may have considered telling the GSA the IRS would not occupy the plaintiff's building if it was selected. The second email, from 2022, reflects another IRS employee reiterating the same suggestion. The third email, from the IRS decisionmaker, is ambiguous and could be read to support the plaintiff's claim but equally could be read not to.

The plaintiff lacks clear and convincing evidence that IRS employees acted based on improper motives. The plaintiff does not have proof that that the IRS told the GSA it would refuse to occupy the plaintiff's building, only that the "GSA was informed [the IRS] did not want this building." (ECF 1-2 at 6.) The plaintiff also has no clear evidence that Mr. Mount, the IRS decisionmaker, agreed with his colleagues that the IRS should refuse to occupy the plaintiff's building if the GSA awarded Bear Mountainside the contract.

That is not say there are no similarities between this case and those on which the plaintiff relies, or that the plaintiff completely lacks evidence to support its claim. The timing of the IRS email requesting cancellation of the solicitation only after the IRS had apparently been informed that the plaintiff's building would be awarded the contract is suspicious. The suspicion is magnified by the history between 2017 and 2022 during which IRS employees suggested among themselves that the IRS should refuse to occupy the plaintiff's building. Unlike the evidence available to support the conclusions in *Parcel 49C* and *126 Northpoint Plaza*, however, Bear Mountainside lacks clear and convincing evidence either indicating that Mr. Mount shared the improper views of his colleagues or reflecting that Mr. Mount acted because of any improper motivation in requesting the cancellation of the solicitation and in subsequently justifying that request.

Without clear and convincing evidence of *actions* taken to harm the plaintiff by IRS employees, especially by Mr. Mount, Bear Mountainside has failed to show by clear and convincing evidence that the IRS's request to cancel the solicitation and the GSA's decision based on that request were founded on any improper motives or constitute a decision made in bad faith.

20

### C.    The Duty to Fairly Consider All Bids

Bear Mountainside argues that its offer was not fairly considered, and that the cancellation lacks support in the record and is therefore unreasonable.  In support, the plaintiff relies on the same factual points and cases as it relied on to argue the existence of an improper motive.  For example, the plaintiff relies on the fact that the IRS only requested that the GSA terminate the solicitation after the IRS learned that a disfavored bidder was going to win the award, just as in *Parcel 49C* and *126 Northpoint Plaza.*  (ECF 42 at 26-33.)  The plaintiff's argument therefore is the same as its argument on bad faith: the IRS requested the termination of the solicitation because it wanted to avoid the plaintiff winning the award rather than because it was genuinely reconsidering its business needs.  Nevertheless, the plaintiff relies on *Parcel 49C* to argue that this claim should be evaluated by preponderant evidence.  *See Parcel 49C*, 31 F.3d at 1150-54 (discussing the "duty to conduct fair procurements" without referencing a higher evidentiary burden).

The plaintiff correctly argues that this aspect of the plaintiff's claim would typically be evaluated based on the typical preponderant evidence standard.  *See id.*; *Mortg. Contracting Servs.*, 153 Fed. Cl. at 124.  Here, however, the plaintiff's argument is predicated on the facts and evidence on which it relied in challenging the good faith of IRS employees.  In short, the crux of the claim remains that the IRS was biased against it.  The plaintiff cites to the same emails and argues for the same inferences as it did in questioning the motives of IRS officials in requesting the solicitation be cancelled.  In whatever way the plaintiff tries to dress up its argument to avoid the higher burden of proof, at its core the plaintiff challenges the motives of the IRS and the failure of the GSA to resist those improper motives.  Such a claim is paradigmatically one that calls for the application of the clear and convincing evidence standard to the extent the plaintiff's claim challenges the presumption of good faith.

Because the plaintiff has not presented clear and convincing evidence of an improper motive, the presumption of good faith applies to the motives of the IRS and GSA employees in requesting and implementing the cancellation of the solicitation.  Although the standard of proof to prevail on this claim is lower, the unrebutted presumption of good faith tips the scales.  In evaluating the claim that the IRS did not fairly consider the plaintiff's bid, the presumption of good faith requires construing ambiguous evidence consistent with that presumption.  Applying that presumption here dictates finding that the IRS acted in good faith in making the cancellation request.  When the evidence is so construed, the plaintiff is left without any evidence that the IRS did not fairly consider its bid.  In other words, because the plaintiff's claim that the IRS did not fairly consider its bid is so tied up in its claim of bad faith, the two claims must fall together, despite the lower standard of review.

### D.    The Rational Basis of the Cancellation Decision

The plaintiff next claims that the GSA lacked a rational basis for the cancellation decision.  The plaintiff asserts that "the IRS did not, and still has not, provided a coherent explanation justifying the changed requirements, let alone any contemporaneous data or information to support the alleged change in requirements which resulted in the cancellation decision."  (ECF 42 at 33 (citing *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 543-44

21

(2011)).)  The plaintiff contends that the IRS has offered only "contradictory and conflicting" statements to support the cancellation request.  The plaintiff also argues that the IRS's decision to extend its existing lease in Springfield undercuts the IRS's asserted justification presented to the GAO in Mr. Lombardi's affidavit that the IRS wanted to consolidate employees from the plaintiff's and the Springfield buildings.[8]  (*Id.* at 33-36.)

A plaintiff may prevail if an agency explains its actions in a way that runs counter to the evidence before it or if fails to provide "a coherent and reasonable explanation of its exercise of discretion . . . [but] the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (cleaned up); *see also Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).  A court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The IRS has offered three justifications for the cancellation request.  These three justifications are consistent with each other.  Taken together and viewed alongside the reality of the post-pandemic work environment, and the rationale the GSA provided the plaintiff when it cancelled the solicitation, the facts reflect that the defendant has provided a coherent, rational basis on which to cancel the solicitation.

First, Mr. Mount explained in his November 2022 email to Ms. Fitzpatrick that "[w]e will be terminating the [plaintiff's] lease and looking to consolidate IRS operations there and in Springfield to the [***] area due to changing IRS business needs."  (AR 3574.)  Regarding these needs, Mr. Mount referenced a desire to be close to the "Northeastern Corridor Train Rail" and the fact that IRS "[useable square footage needs] will increase due to planned new hires and need for additional storage space."[9]  (*Id.*)  Mr. Mount also indicated that IRS officials were "still

---

[8] Normally, post-hoc statements offered by an agency to justify its actions once legal challenges to that action have started would be disfavored and not considered in evaluating the legality of the challenged action.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).  Bear Mountainside has, however, claimed that the defendant lacked a rational basis to cancel the solicitation because of asserted conflicts and contradictions among the various rationales offered by IRS officials to support the request to cancel the solicitation.  (ECF 42 at 33-36.)  The plaintiff therefore cannot complain about consideration of Mr. Lombardi's affidavit when the plaintiff has put statements contained in Mr. Lombardi's affidavit at issue.  (*Id.* at 34 ("However, the Gary Lombardi affidavit, submitted during the GAO protest, contradicted that assertion.").)  As for considering the defendant's interrogatory response, not only did the plaintiff put them at issue (*id.* ("Moreover, the response to Interrogatories submitted to the IRS . . . ."), but it is responsible for their existence by seeking discovery from the IRS.

[9] [***], New Jersey, is the site of the [***] station on Amtrak's Northeast Corridor running between Boston and Washington.

discussing location need for our Taxpayer Assistance Center in Springfield." (*Id.*)  Mr. Mount's explanation therefore indicated a need to consolidate existing IRS offices while increasing available square footage and possibly maintaining the Taxpayer Assistance Center in the Springfield office.

Next, in his affidavit to the GAO, Mr. Lombardi explained that "since the IRS transmitted its needs to the [GSA] for office space in the Springfield and Mountainside areas, there have been a number of changes to the needs of the IRS." (AR 3809.)  More specifically, he averred that the IRS had, at the time of his affidavit, not yet determined its space needs in the New Jersey region because "the IRS has been engaged in return to office activities as the COVID-19 crisis has subsided." (*Id.*)  He elaborated that "[a]s return to the office activities have progressed the Agency has found that the way its workforce performs it[s] duties has drastically changed.  As a result of this change the IRS believes that consolidation of offices may better meet the Agenc[y's] need." (*Id.*)  Concerning the Taxpayer Assistance Center, Mr. Lombardi noted that IRS officials were still discussing its location due to a "potential need for the . . . office to remain within the Congressional District where that office is currently located." (AR 3810.)

Mr. Lombardi's explanation is consistent with Mr. Mount's.  Like Mr. Mount, Mr. Lombardi referenced a need to consolidate offices and a need to keep the Taxpayer Assistance Center where it is currently located, in Springfield.[10]  Although Mr. Lombardi did not express a need to increase the square footage of office space, his silence on the subject does not foreclose that possibility.  Mr. Lombardi noted that the IRS was "continuing to evaluate its needs and has not reached a final decision with regards to how much space will be required, what the specific requirements of that space will be, and where that space would best be located." (AR 3809.)  Mr. Lombardi's reference to the pandemic can be considered a more detailed explanation of the justification for the cancellation request first offered by Mr. Mount.

Finally, Mr. Mount again explained the cancellation request in the response to the plaintiff's interrogatories.  The response explains that the IRS has been evaluating its "changing needs" following the June 25, 2022, Return to Office order and is engaged in internal discussions regarding its space needs.  Mr. Mount continued:

> Those discussions predominantly included the impact of more telework, as well as the subsequent increase in hiring that would occur due to the Inflation Reduction Act (IRA), which was signed into law in August 2022.  These would have an impact on IRS space requirements.  Combined, both affected IRS Business Unit requirements and subsequent changes in FMSS planning and

---

[10] The plaintiff argues that "Mr. Lombardi claimed that the IRS may need <u>less</u> space," but it is unclear what language the plaintiff is relying on to support that assertion.  (ECF 42 at 34 (emphasis in original).)  At most, Mr. Lombardi's affidavit noted a need to consolidate offices, but a consolidation of offices does not necessarily imply a need for less office space.

analysis of workspace, including hoteling, teleworking, and more
training rooms for the IRA hires.

(ECF 43-1 at 2; *see also id.* at 4.)

The interrogatory response goes on to refer to the strategy detailed in Mr. McClain's
October 2022 email that outlined a plan to consolidate the office in the plaintiff's building into
the Springfield office before moving that office to the [***] area.  Mr. McClain's email also
expressed a desire to move the "Tax Assistance Center," but noted that a separate acquisition
may be required if that facility is to remain within its current Congressional district.  (*Id.* at 3.)

Nothing in Mr. Mount's interrogatory response is inconsistent with the two earlier
justifications for the cancellation request to show that the defendant lacked a rational basis in
requesting cancellation of the solicitation.  Although the interrogatory response is the first to
mention the Inflation Reduction Act, Mr. Mount's first explanation in response to Ms.
Fitzpatrick's request that the IRS justify its cancellation request referred to the need for space to
accommodate additional employees.  That reference can easily be read as consistent with the
Inflation Reduction Act reference in the interrogatory response.  The reference to the return-to-
office order is consistent with the earlier reference to the pandemic.[11]  The discussion regarding
the location of the Taxpayer Assistance Center is consistent with the prior justification that
indicated that office might need to stay at its Springfield location within the same congressional
district.

Most importantly, none of the IRS's explanations contradict each other.  Rather, they
support each other and, crucially, support the explanation the GSA provided to the plaintiff when
it cancelled the solicitation: "[t]he Government [ ] hereby cancels the [solicitation] due to a
change in circumstances.  The Government is reevaluating requirements.  It is, therefore, in the
best interests of the Government to cancel the [solicitation]."  (AR 3031.)  The IRS's three
justifications for its request to the GSA to terminate the solicitation differ on certain details and
emphasis, but they may easily be read consistently with one another; the differences reflect
merely the passage of time and the state of internal IRS discussions regarding office-space needs
in northern New Jersey.  The minor differences among these three justifications fall far short of
supporting a claim that the IRS lacked a rational basis when it requested the solicitation be
cancelled and the GSA, in response, terminated the solicitation.

The plaintiff's remaining arguments fare no better.  The plaintiff argues that extending
the existing Springfield lease is inconsistent with the rationale for cancelling the solicitation.
The record does not support that argument.  Two of the three IRS justifications explicitly refer to
a potential need to keep the Taxpayer Assistance Center in Springfield.  It is also hardly
surprising that the IRS's consolidation of its offices would involve keeping some offices open

---

[11] The plaintiff argues that the IRS's stated need for more staffing while also considering
more telework is inherently contradictory as to space requirements.  (ECF 42 at 34.)  This
potential contradiction is not, however, dispositive and can be explained by rationales that are
neither improper nor nefarious, especially when an agency is still in the planning process.

during the consolidation process.  The plaintiff correctly notes that the stated purpose of the solicitation, according to the GSA's 2020 project plan, was to consolidate the Springfield and Mountainside offices.  (ECF 42 at 35 (citing AR 21).)  Letting the plaintiff's lease expire and extending the Springfield lease is not inconsistent with the decision to cancel the solicitation, as the plaintiff argues; it is simply a different way to accomplish the same goal while the IRS reconsiders its ultimate business needs.  In any case, as the defendant noted during oral argument, the consolidation mentioned in the GSA's 2020 project plan for the solicitation was based on the GSA's needs after assuming responsibility from the IRS for leasing space for the IRS.  (*See* AR 21; note 4, above.)  In contrast, the consolidation mentioned in Mr. Mount's cancellation email concerns the IRS's needs, including the possible relocation of the Mountainside and Springfield offices to the [***] area.  (AR 3574.)  Two different agencies can use the same term to mean different things based on their specific needs, as appears to have been the case here.

As for the plaintiff's claim in its reply brief (ECF 48 at 18-20) that the IRS requested cancellation of the solicitation based on the whim of IRS officials attributable to personal animus, and therefore no rational basis exists for the decision, this challenge essentially reiterates the plaintiff's already-rejected bad-faith argument.  For the same reason, that argument fails again, because the IRS and GSA are presumed to have acted in good faith.

The IRS had a rational basis to request the solicitation be cancelled, and the GSA had a rational basis to cancel the solicitation.

### E.    The Documentation of the Cancellation Decision

Finally, the plaintiff challenges the cancellation decision by arguing that Ms. Fitzpatrick, the GSA contracting officer, "failed to adequately document her decision to cancel the Solicitation and thus there is no basis . . . to conclude that she reasonably exercised her discretion in canceling the Solicitation."  (ECF 42 at 36.)  In support, the plaintiff cites GSAR 570.303-4(a) and (e) which provide:

> (a)  If the Government's requirements change, either before or after receipt of proposals, issue an amendment.  Document the amendment using the same method as for the [solicitation for offers], written or electronic.
>
> . . .
>
> (e)  If there are changes to the Government's requirements for amount of space, delineated area, occupancy date, and/or other major aspects of the requirements, the contracting officer shall consider whether there is a need to readvertise, and to document the file accordingly.

Additionally, GSAR 570.303-4(d) provides that "[i]f an amendment is so substantial that it requires a complete revision of the [solicitation for offers], cancel the [solicitation for offers], readvertise if required by 570.106, and issue a new [solicitation for offers]."

The plaintiff argues that Ms. Fitzpatrick did not engage in the required analysis and documentation, claiming that "a few slipshod email correspondences between the IRS and GSA . . . do not meet the documentation requirements of the GSAR and thus fail to provide a reasoned basis for cancellation." (ECF 42 at 37.)  Specifically, the plaintiff argues Ms. Fitzpatrick should have required more detail from the IRS about the need for additional space to accommodate potential new hires and requested more information to support the IRS's claim that [***] was its ideal location.  (*Id.*)  As a corollary, the plaintiff argues Ms. Fitzpatrick never required the IRS to provide her with the facts necessary for her to determine independently whether the IRS's changing needs were so substantial as to require the cancellation of the solicitation.  (*Id.*)

The defendant responds that the regulation does not require a specified level of detail, and that precedent simply requires a "'coherent and reasonable explanation of [an agency's] exercise of discretion.'"  (ECF 49 at 21 (quoting *DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 511 (2008)).)  The defendant asserts that Ms. Fitzpatrick's request to Mr. Mount seeking a justification for the cancellation request satisfied these requirements.  (*Id.*)  Additionally, the defendant relies on GSAR 570.303-4(d) and (e) to argue that the solicitation had to be cancelled because of the substantial changes to the IRS's needs.  (*Id.* at 8-9.)

Neither party cites any authority interpreting the specific regulation at issue.  Instead, each cites cases that address generally the need for an agency to have a rational basis that is supported by the administrative record for its decisions.  For example, the plaintiff cites *Starry Associates, Inc. v. United States*, but that case dealt with a challenge to the rational basis of an agency's decision and makes no mention of any specific regulation.  *See* 127 Fed. Cl. 539, 550 (2016) (emphasis added) (concluding that "the record contains no basis on which the agency can pin the *rationality* of its decision to cancel").[12]  The defendant relies on *DCMS-ISA, Inc. v. United States*, which dealt with the rational basis of a decision made under FAR 15.305(b).  That regulation applies when the government rejects all proposals and is not applicable when, as here, the solicitation is cancelled.  *See* 84 Fed. Cl. at 513.  These cases are thus inapposite to the challenge the plaintiff brings: that Ms. Fitzpatrick failed to consider and make an independent judgment on whether the IRS's asserted changed needs were so significant as to require the solicitation to be cancelled and failed to document the record to reflect her decision, as required by GSAR 570.303-4.

---

[12] While there are cases dealing with an agency's failure to document a decision, there is no freestanding requirement for an agency to document every decision it may make on the path to a final decision, as the plaintiff seems to imply.  (*See* ECF 42 at 36.)  Rather, agencies need to document their preliminary decisions because "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or *if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it*, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added).

Interpretation of GSAR 570.303-4(d) and (e) appears to be a matter of first impression in the court.  "To interpret a regulation [a court] must look at its plain language and consider the terms in accordance with their common meaning."  *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997).

> When interpreting regulations, we apply the same interpretive rules we use when analyzing the language of a statute.  *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015) (citing *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005)).  And it is well established that, when interpreting statutes or regulations, "[t]he plain meaning that we seek to discern is the plain meaning of the whole statute [or regulation], not of isolated sentences."  *Beecham v. United States*, 511 U.S. 368, 372, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994) (citations omitted).

*Boeing Co. v. Sec'y of Air Force*, 983 F.3d 1321, 1327 (Fed. Cir. 2020).

Subsection (d) of GSAR 570.303-4 requires cancellation of a lease solicitation "[i]f an amendment is so substantial that it requires a complete revision of the" solicitation.  The regulation does not specify what would make an amendment "so substantial that it requires a complete revision of the [solicitation for offers]."  The regulation seems to rely on the types of changes listed in subsection (e) to delineate the types of changes that might be substantial enough to require cancellation of a solicitation.  These amendments include "changes to the Government's requirements for amount of space, delineated area, occupancy date, and/or other major aspects of the requirements," as these types of changes trigger the requirement for "the contracting officer [to] consider whether there is a need to readvertise, and to document the file accordingly."  It does not follow, however, the rule requiring a contracting officer to "consider whether there is a need to readvertise" because there was a change to the needs for "amount of space, delineated area, occupancy date, and/or other major aspects of the requirements" means that any such change is "substantial."  GSAR 570.303-4(d)-(e).  Instead, such a change *might* be substantial enough, depending on the context.  Even then, the regulation simply does not specify the extent of analysis required or standards a contracting officer must use in deciding whether an amendment would "require[ ] a complete revision of the [solicitation for offers]."  GSAR 570.303-4(d).  In this regard, the regulation can provide no more than general guidance, as every solicitation will differ, and revisions and amendments will come in different shapes and sizes.  No regulation can determine how it will apply to every set of factual permutations.

As the plaintiff challenges the failure to document the cancellation decision, the analysis starts with that aspect.  The verb "document" is not defined in the relevant definitions section, GSAR 570.102.  In the absence of any specialized or technical definition, a court looks to the plain language of the regulation.  There is nothing technical in the use of "document" as a verb in GSAR 570, and nothing to suggest it is a term of art intended to mean more than to record a decision in writing.  That normal usage will be applied to evaluate the plaintiff's claim.

To "document" can mean "to record something in the form of a written document, photograph, film, etc."  *Document*, OxfordLernersDictionaries.com,

https://www.oxfordlearnersdictionaries.com/us/definition/english/document_2 (last visited September 25, 2023).  There are other definitions, of course.  For example, to "document" can also mean "to support or accompany something with documents" *id.*, or "to provide with factual or substantial support for statements made or a hypothesis proposed," *Document*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/document#dictionary-entry-2 (last visited September 25, 2023).

Nevertheless, the simplest definition of simply recording information seems the most likely based on the way the word is used in the regulations.  Subsection (a), the only other subsection of GSAR 570-304 to use the word "document," provides "[d]ocument the amendment using the same method as for the [solicitation for offers], written or electronic."  There, document is obviously being used to mean simply to record or to reduce to writing.  This reading aligns with other usages of the verb "document" in other provisions of GSAR 570.  For example, GSAR 570.111 provides:

> Before accepting the space, the contracting officer must verify that the space complies with the Government's requirements and specifications and *document* this in an inspection report. . . . When space such as piers, antennas, and parking are leased, square footage may not be the manner in which the amount of space is specified; therefore, *document* that the space complies with the Government's written requirements.

(Emphasis added).  For another example, GSAR 570.502-2(e) requires a contracting officer to "[d]ocument the analysis under this paragraph and the resulting negotiation objectives."  All these usages of the word "document" imply simply recording information in a file, and not necessarily including additional documentation or analysis beyond what the regulations require GSA to record in writing.  The plaintiff's contrary reading of the word "document" to require a GSA contracting officer to investigate and make an independent judgment as to an agency's space needs is unpersuasive.  The result would be that the GSA could force a tenant agency to accept space the tenant agency itself does not believe it needs.  Such a reading would stretch the meaning of the documentation requirement to the breaking point.

Under the more straightforward definition of the word "document," Ms. Fitzpatrick at most had to record any changes made to the IRS's space needs.  Those needs, however, had not yet been finally determined at the time the IRS requested the solicitation be cancelled.  Thus, Ms. Fitzpatrick could only document what she was told by the IRS at the time.  In requesting additional information from Mr. Mount to justify the IRS's cancellation request beyond his initial statement that the IRS was "reviewing [its] business needs" (AR 3572), and then documenting the subsequently provided information, Ms. Fitzpatrick satisfied her obligation under the regulation.  Under the facts of this case, she adequately "documented the file" to reflect the information she had received about how the IRS's needs were changing in sufficient detail to make a judgment as to whether an amendment to the solicitation would be possible.  To require more would have required the IRS to produce information that it had not yet determined for itself; the regulation cannot be reasonably read to require an impossibility.  (AR 3574 ("We are still discussing location need for our Taxpayer Assistance Center in Springfield.  Once that

decision has been made a new DA, FMSS-81, and full requirements package will be provided [to] GSA.").)  Ms. Fitzpatrick adequately documented the decision to cancel the solicitation.

The second aspect of the plaintiff's challenge is to the alleged failure by Ms. Fitzpatrick to perform her own independent analysis of whether the IRS's asserted justification satisfied the requirement of GSAR 570.303-4.  As for the level of information available to Ms. Fitzpatrick in making her decision, Mr. Mount informed her that the IRS was considering leaving the Mountainside/Springfield area to consolidate and move the staff in those offices to [***].  (*Id.*)  Mr. Mount's later interrogatory response also reiterated this intended plan to move operations to the [***] area.  (ECF 43-1 at 2-3.)  Such a move would substantially change the delineated area.  (AR 3, 10, 2140, 3574 (informing Ms. Fitzpatrick that "a new DA" would be provided).)  In effect, Mr. Mount told Ms. Fitzpatrick that the IRS was no longer looking for an office within the delineated area and was looking for office space outside it.  As such, any amendment would have met the requirements under subsection (e) such that the contracting officer had to consider a need to readvertise.  Further, given the change to the delineated area was so significant, it seems this change would have to qualify as one "so substantial that it requires a complete revision of the [solicitation for offers] . . . ."  GSAR 570.303-4(d).  Ms. Fitzpatrick therefore had an adequate basis to determine that the solicitation had to be cancelled, as required by GSAR 570.303-4, a finding she implicitly made when she cancelled the solicitation.  (AR 3575.)

Even if the GSA had violated GSAR 570.303-4's documentation requirement, the plaintiff has not shown how it would have been prejudiced by this failure.  The plaintiff's briefs are entirely devoid of any reference to prejudice except for quoting *126 Northpoint Plaza*'s reference to a requirement to show "'by clear and convincing evidence, that either: . . . (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations.'"  (ECF 48 at 15 (quoting *126 Northpoint Plaza*, 34 Fed. Cl. at 107).)  To prevail, however, the plaintiff must show, in addition to a violation of a statute or regulation, "as a factual matter, [that it] was prejudiced by that conduct."  *Bannum,* 404 F.3d at 1351.  The plaintiff bears the responsibility to make that showing, and Bear Mountainside has failed to do so.  While the plaintiff suggested how it might be prejudiced by the asserted violation of GSAR 570.303-4 at oral argument in response to questions, this belated effort is insufficient to demonstrate prejudice had there been a violation of that regulation.

## V.    CONCLUSION

The plaintiff has not shown that the defendant acted based on an improper motive in cancelling the solicitation or failed to fairly consider the plaintiff's bid.  In the absence of clear and convincing evidence that they acted in bad faith, government officials are presumed to act in good faith in executing their duties, and the GSA had a rational basis to cancel the solicitation, which was adequately documented by the contracting officer.  The plaintiff's motion for judgment on the administrative record is denied and the defendant's motion is granted. A separate order reflecting this decision will be entered directing judgment for the defendant.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**